Public Copy - Sealed Material Deleted

ORAL ARGUMENT NOT YET SCHEDULED

No. 14-1016

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

HERMES CONSOLIDATED, LLC,
doing business as WYOMING REFINING COMPANY,

Petitioner

v.

ENVIRONMENTAL PROTECTION AGENCY,

Respondent

_____

On Petition for Review of an Order of the
United States Environmental Protection Agency

_____

BRIEF FOR PETITIONER

_____

LeAnn Johnson Koch
William Pedersen
Tyler G. Welti
PERKINS COIE LLP
700 13th St., N.W.
Washington, D.C. 20005
Telephone: 202.654.6200

Eric D. Miller
EMiller@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone:  206.359.8000

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A. Parties and Amici.** Petitioner is Hermes Consolidated, LLC, doing business as Wyoming Refining Company. Respondent is the United States Environmental Protection Agency.

**B. Rulings Under Review.** The ruling under review is an order of the Environmental Protection Agency, *Denial of Request for Extension of Small Refinery Temporary Exemption Under the Renewable Fuel Standards Program for Wyoming Refining Co.'s Newcastle, WY Refinery*, dated January 31, 2014. The order and accompanying memorandum may be found at J.A. 13, 316-338.

**C. Related Cases.** The order under review was the subject of a petition for review in the Tenth Circuit. *Hermes Consolidated, LLC dba Wyoming Refining Co.* v. *EPA*, No. 14-9522 (10th Cir. Mar. 4, 2014). That petition was voluntarily dismissed on March 11, 2014.

MATERIAL UNDER SEAL DELETED

## RULE 26.1 DISCLOSURE STATEMENT

Wyoming Refining Company operates a petroleum refinery in northeastern Wyoming. Wyoming Refining Company is 100% owned by Black Elk Refining, LLC, which is owned by ██████████████, and ██████████████████████. None of those entities is publicly traded, and no publicly traded company owns more than 10% of their stock.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................................................................................. i

RULE 26.1 DISCLOSURE STATEMENT ................................................ ii

GLOSSARY ........................................................................................ viii

STATEMENT OF JURISDICTION ......................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............. 1

STATUTORY AND REGULATORY ADDENDUM ................................ 2

STATEMENT OF THE CASE ................................................................ 2

    I.    Statutory and regulatory background ................................... 2

        A.    Renewable fuel volume requirements ......................... 2

        B.    Trading of renewable identification numbers ............. 6

        C.    Small refinery hardship relief ................................... 10

    II.    Wyoming Refining Company ............................................. 14

    III.    WRC's petition for a disproportionate-hardship exemption ......................................................................... 17

    IV.    EPA's rejection of WRC's petition ..................................... 18

SUMMARY OF ARGUMENT ............................................................. 20

STANDING ........................................................................................ 22

STANDARD OF REVIEW ................................................................... 23

ARGUMENT ....................................................................................... 24

    I.    EPA acted arbitrarily in denying hardship relief on the ground that regulatory compliance would not impair WRC's viability ................................................................... 24

        A.    EPA's focus on viability is contrary to the statutory language ...................................................... 25

# TABLE OF CONTENTS
## (continued)

**Page**

B.  EPA failed to explain or give notice of the change in its method of assessing viability............................ 29

II.  EPA failed to take account of the dysfunctional market for RINs ..................................................................... 32

A.  High RIN prices exacerbate the disproportionate hardship inflicted on small merchant refineries that must purchase RINs.......................................... 32

B.  RIN prices are far higher than the cost of blending........................................................................ 36

C.  EPA did not adequately consider the effect of WRC's obligation to purchase RINs ........................... 37

III.  EPA acted arbitrarily in basing its decision on WRC's issuance of a dividend in 2012 ............................................ 42

IV.  EPA erred in assessing WRC's financial condition ............. 47

CONCLUSION ................................................................................... 55

# TABLE OF AUTHORITIES

**Page**

C<small>ASES</small>

*AEP Tex. N. Co. v. STB,*
  609 F.3d 432 (D.C. Cir. 2010) ........................................................47

*Agape Church, Inc. v. FCC,*
  738 F.3d 397 (D.C. Cir. 2013) ........................................................26

*Am. Petroleum Inst. v. EPA,*
  706 F.3d 474 (D.C. Cir. 2013) ..........................................................7

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.,*
  724 F.3d 243 (D.C. Cir. 2013) ........................................................22

*Chevron U.S.A. Inc. v. NRDC,*
  467 U.S. 837 (1984)........................................................................26

*In re Ctr. for Auto Safety,*
  793 F.2d 1346 (D.C. Cir. 1986) ......................................................46

*Judulang v. Holder,*
  132 S. Ct. 476 (2011)......................................................................27

*Kennecott Corp. v. EPA,*
  684 F.2d 1007 (D.C. Cir. 1982) ......................................................27

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992)........................................................................23

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force,*
  375 F.3d 1182 (D.C. Cir. 2004) ......................................................23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)..........................................................23, 27, 32

*Shieldalloy Metallurgical Corp. v. NRC,*
  624 F.3d 489 (D.C. Cir. 2010) ........................................................31

S<small>TATUTES</small>

5 U.S.C. § 706(2)(A) ..........................................................................23

26 U.S.C. § 701 ..................................................................................53

42 U.S.C. § 7401 ..................................................................................2

42 U.S.C. § 7419(d)(2)........................................................................27

---

* Authorities on which we chiefly rely are marked with an asterisk.

# TABLE OF AUTHORITIES
(continued)

**Page**

42 U.S.C. § 7545(d)(1)..................................................................5

42 U.S.C. § 7545(o)(1)(K)...........................................................11

42 U.S.C. § 7545(o)(2)(A)(i) .........................................................3

42 U.S.C. § 7545(o)(2)(A)(iii)(I) ...................................................5

42 U.S.C. § 7545(o)(2)(B)(i)(I)......................................................2

42 U.S.C. § 7545(o)(3)(A)...............................................................3

42 U.S.C. § 7545(o)(3)(B)(i) ...........................................3, 4, 45

42 U.S.C. § 7545(o)(3)(B)(ii) .........................................................5

42 U.S.C. § 7545(o)(3)(B)(ii)(I) .....................................................4

42 U.S.C. § 7545(o)(3)(B)(ii)(II) ...................................................3

42 U.S.C. § 7545(o)(5)(A)(i) ..........................................................7

42 U.S.C. § 7545(o)(5)(B) ...............................................................7

42 U.S.C. § 7545(o)(7)(A)(ii) .........................................................3

42 U.S.C. § 7545(o)(9)(A)(ii)(I) .....................................................9

42 U.S.C. § 7545(o)(9)(A)(ii)(II) .................................................11

42 U.S.C. § 7545(o)(9)(B) ...............................................................1

42 U.S.C. § 7545(o)(9)(B)(i) ............................ 11, 20, 24, 27, 45

42 U.S.C. § 7545(o)(9)(B)(ii) .......................................................11

42 U.S.C. § 7545(o)(9)(B)(iii) ...............................................11, 18

42 U.S.C. § 7607(b)(1)....................................................................1

Energy Policy Act of 2005, § 1501(a), Pub. L. No. 109-58,
    119 Stat. 1067 ...........................................................................2

**OTHER AUTHORITIES**

40 C.F.R. § 80.1141(e) ................................................................11

40 C.F.R. § 80.1401 .......................................................................8

40 C.F.R. § 80.1406 .......................................................................4

40 C.F.R. § 80.1406(a) ...................................................................5

40 C.F.R. § 80.1407 .......................................................................4

# TABLE OF AUTHORITIES
### (continued)

**Page**

40 C.F.R. § 80.1415 ................................................................8

40 C.F.R. § 80.1427 .............................................................5, 8

40 C.F.R. § 80.1427(a)(6) ......................................................8

40 C.F.R. § 80.1451 ................................................................8

40 C.F.R. § 80.1463 ................................................................5

40 C.F.R. § 80.1451(a) ...........................................................5

H.R. Rep. No. 111-278 (2009) ..........................................12, 28

Regulation of Fuels and Fuel Additives:
   2011 Renewable Fuel Standards,
   75 Fed. Reg. 76,790 (Dec. 9, 2010)....................................4

Regulation of Fuels and Fuel Additives:
   2012 Renewable Fuel Standards,
   77 Fed. Reg. 1320 (Jan. 9, 2012)........................................4

Regulation of Fuels and Fuel Additives:
   2013 Renewable Fuel Standards,
   78 Fed. Reg. 49,794 (Aug. 15, 2013) ...........................4, 9, 36

Regulation of Fuels and Fuel Additives:
   Changes to Renewable Fuel Standard Program,
   75 Fed. Reg. 14,670 (Mar. 26, 2010)..............4, 6, 8, 33, 44

Regulation of Fuels and Fuel Additives:
   Renewable Fuel Standard Program,
   72 Fed. Reg. 23,900 (May 1, 2007) .........................7, 8, 44

S. Rep. No. 111-45 (2009) ........................................12, 28, 34

# GLOSSARY

DOE         Department of Energy

EBITDA      Earnings before interest, taxes, depreciation, and amortization

EPA         Environmental Protection Agency

RIN         Renewable identification number

SEC         Securities and Exchange Commission

WRC         Wyoming Refining Company

## STATEMENT OF JURISDICTION

The Environmental Protection Agency had jurisdiction to rule on Wyoming Refining Company's petition for an exemption from the renewable fuel standards under 42 U.S.C. § 7545(o)(9)(B). On January 31, 2014, EPA issued a final decision rejecting the petition. J.A. 13. A timely petition for review was filed on February 3, 2014. The jurisdiction of this Court rests on 42 U.S.C. § 7607(b)(1).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether EPA acted unlawfully in requiring a petitioner for relief under a statute that provides for relief in cases of "disproportionate economic hardship" to demonstrate hardship so severe as to impair its viability.

2. Whether EPA's denial of Wyoming Refining Company's hardship petition was arbitrary and capricious because it failed to take account of the consequences of the dysfunctional market created by EPA's regulatory actions, and because the agency changed its standards for deciding hardship petitions without prior notice.

3. Whether EPA acted arbitrarily and capriciously in denying Wyoming Refining Company's petition on the basis of actions the com-

pany took before EPA even proposed the rule from which the company sought relief.

4. Whether EPA acted arbitrarily and capriciously in basing its decision on a flawed assessment of Wyoming Refining Company's financial condition.

## STATUTORY AND REGULATORY ADDENDUM

Pertinent statutory and regulatory provisions are set forth in an addendum to this brief.

## STATEMENT OF THE CASE

## I.    Statutory and regulatory background

## A.    Renewable fuel volume requirements

1. In 2005, Congress amended the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.*, to promote renewable fuels such as ethanol and bio-diesel. Energy Policy Act of 2005, § 1501(a), Pub. L. No. 109-58, 119 Stat. 1067. To that end, the statute prescribes a total annual volume of renewable fuel to be used in the United States, with the specified volume increasing each year. In 2014, for example, the statute calls for the use of 18.15 billion gallons of renewable fuel. 42 U.S.C. § 7545(o)(2)(b)(B)(i)(I).

Congress directed EPA to issue regulations "to ensure that transportation fuel sold or introduced into commerce in the United States . . . , on an annual average basis, contains the applicable volume of renewable fuel" set out in the statute. 42 U.S.C. § 7545(o)(2)(A)(i). Each year, the Energy Information Administration, a component of the Department of Energy, must calculate the total volume of transportation fuel projected to be sold in the United States. *Id.* § 7545(o)(3)(A). EPA must then set a "volume percentage" requirement for renewable fuels in order to ensure that overall usage meets the statutory target. *Id.* § 7545(o)(3)(B)(ii)(II). For example, if the total projected transportation consumption in the United States in a particular year were 100 billion gallons of non-renewable fuel, and if the statute called for the use of 10 billion gallons of renewable fuel in that year, then EPA would set a volume percentage of 10%. EPA has discretion, however, to reduce the volume percentage in certain circumstances, including "inadequate domestic supply" of renewable fuel. *Id.* § 7545(o)(7)(A)(ii).

Although EPA is required to publish the renewable volume percentage for each calendar year by November 30 of the prior year, the agency has repeatedly failed to meet that statutory deadline. 42 U.S.C.

§ 7545(o)(3)(B)(i); *see* Regulation of Fuels and Fuel Additives: 2013 Renewable Fuel Standards, 78 Fed. Reg. 49,794 (Aug. 15, 2013) ("2013 Rule"); Regulation of Fuels and Fuel Additives: 2012 Renewable Fuel Standards, 77 Fed. Reg. 1320 (Jan. 9, 2012); Regulation of Fuels and Fuel Additives: 2011 Renewable Fuel Standards, 75 Fed. Reg. 76,790 (Dec. 9, 2010); Regulation of Fuels and Fuel Additives: Changes to Renewable Fuel Standard Program, 75 Fed. Reg. 14,670 (Mar. 26, 2010) ("2010 Rule"). As of May 2014, EPA still had not issued the standard for 2014.

2. Obligated parties—that is, persons who are subject to the regulations—must demonstrate that they meet a required volume, known as the annual renewable volume obligation. 42 U.S.C. § 7545(o)(3)(B)(ii)(I); 40 C.F.R. § 80.1406. The renewable volume obligation is determined by multiplying the volume of non-renewable fuel that the obligated party produces or imports in a calendar year by the applicable volume percentage published annually by EPA. *See* 42 U.S.C. § 7545(o)(3)(B)(i); 40 C.F.R. § 80.1407. For example, if the volume percentage were 10%, an obligated party that produced 100,000

gallons of non-renewable fuel would be required to demonstrate that 10,000 gallons of renewable fuel had been used.

Obligated parties must submit a compliance report to EPA by February 28 of each year for the preceding calendar year. 40 C.F.R. § 80.1451(a). Parties that fail to meet their obligations may face substantial penalties, although in limited circumstances they may make up a shortfall in the next calendar year. See 42 U.S.C. §§ 7545(d)(1), 7545(o)(3)(B)(ii); 40 C.F.R. §§ 80.1427, 80.1463.

3. The statute does not identify or define the obligated parties. Instead, it gives EPA discretion to adopt "compliance provisions applicable to refineries, blenders, distributors, and importers, as appropriate, to ensure" that the overall volume requirements are satisfied. 42 U.S.C. § 7545(o)(2)(A)(iii)(I); *see also id.* § 7545(o)(3)(B)(ii)(I). Refiners produce petroleum-based fuels; companies called "blenders" then blend renewable fuel into the petroleum blendstock to produce finished transportation fuel that is ultimately sold to consumers. The refinery and blender roles are not mutually exclusive; often, a company is both a refiner and a blender of some or all of its own production.

EPA has imposed the compliance obligation on refiners and importers. 40 C.F.R. § 80.1406(a). EPA justified that choice on the basis of administrative convenience, explaining that "the obligations were placed on the relatively small number of refiners and importers rather than on the relatively large number of downstream blenders and terminals in order to minimize the number of regulated parties and keep the program simple." 2010 Rule, 75 Fed. Reg. at 14,722. When it revisited the question in 2010, the agency noted that "essentially all downstream blenders and terminals are now regulated parties . . . since essentially all gasoline will be blended with ethanol," and therefore the original rationale "for placing the obligation on just the upstream refiners and importers is no longer valid." *Id.* EPA nevertheless chose not to change the designation of obligated parties because obligated parties who cannot themselves blend renewable fuel into the petroleum-based fuel can comply by purchasing credits from those who can. *Id.*

## B.    Trading of renewable identification numbers

A key part of the statutory scheme is the system of tradable credits for the use of renewable fuel. Congress directed EPA to provide "for

the generation of an appropriate amount of credits by any person that refines, blends, or imports gasoline that contains a quantity of renewable fuel that is greater than the quantity required." 42 U.S.C. § 7545(o)(5)(A)(i). An entity that generates such credits "may use the credits, or transfer all or a portion of the credits to another person, for the purpose of complying" with the obligations imposed by the regulations. *Id.* § 7545(o)(5)(B). The ability to comply by purchasing credits is important because, as EPA has explained, "[m]any obligated parties do not have access to renewable fuels or the ability to blend them, and so must use credits to comply." Regulation of Fuels and Fuel Additives: Renewable Fuel Standard Program, 72 Fed. Reg. 23,900, 23,904 (May 1, 2007) ("2007 Rule"). For example, while some integrated refiners, convenience stores, pipeline operators, and other parties can blend fuel in excess of their obligation, independent or merchant refiners cannot blend fuel even matching their obligation and must purchase credits in order to comply. *See Am. Petroleum Inst.* v. *EPA*, 706 F.3d 474, 480 (D.C. Cir. 2013) (noting that refiners "are in no position to ensure, or even contribute to, [the statutory goal of] growth" in the use of renewable fuels by blenders). "[T]rading mechanisms," EPA has explained,

"ensure that the means to demonstrate compliance will be readily available for use by obligated parties." 2007 Rule, 72 Fed. Reg. at 23,904.

Under EPA's regulations, credits are known as "renewable identi-fication numbers," or "RINs." Each RIN generally represents one gal-lon of renewable fuel produced in—or imported into—the United States. 40 C.F.R. § 80.1427, *see id.* §§ 80.1401, 80.1415. RINs are sepa-rated from a volume of renewable fuel when that fuel is blended with petroleum blendstock (or taken possession of by an obligated party), and they can then be bought, sold, or transferred. *Id.* § 80.1451. They may be used for compliance in the year in which they are produced or in the following year. *Id.* § 80.1427(a)(6).

When the RIN system works as intended, the cost of a RIN should reflect the cost of renewable fuel relative to gasoline. 2010 Rule, 75 Fed. Reg. at 14,670, 14,722. When ethanol is less expensive than gasoline, blenders will use as much ethanol as the market will accept, and RINs will be created regardless of the regulatory mandate. But if ethanol is more expensive, then the price of RINs should be the price of ethanol less the price of gasoline—that is, if ethanol costs 5¢ more per

gallon than gasoline, the cost of separating a RIN should be 5¢, and a refiner should be able to purchase a RIN for approximately 5¢. In a functioning market, a tradable credit program of this kind can help ensure that all refiners face approximately the same compliance costs, whether they blend renewable fuel themselves or rely on others.

Beginning in 2013, however, the statutory renewable fuel volume requirements exceeded the transportation market's ability to absorb renewable fuel, due in part to a technological constraint known as the "E10 blendwall," which reflects the inability of most automobile engines to consume gasoline containing more than 10 percent ethanol. In the 2013 Rule, EPA acknowledged that the statute now required more renewable fuel to be used in that year than could be physically consumed, observing that "the 14.5 [billion gallons] of ethanol that might need to be consumed in 2013" would be "1.4 [billion gallons] above the E10 blendwall." 2013 Rule, 78 Fed. Reg. at 49,822. In other words, statutory volumes would require obligated parties to submit 1.4 billion more RINs than could be separated. EPA further acknowledged that the problem would worsen in 2014 with increasing statutory volume requirements. *Id.* at 49,823. EPA nonetheless set 2013 annual volume

requirements above the blendwall, reasoning that they could be met with RINs carried over from 2012. *See id.* at 49,821 ("In the absence of carryover RINs from 2012, it would be extremely challenging to meet this standard."). That rule is the subject of petitions for review currently pending before this Court. *See Monroe Energy, LLC* v. *EPA*, Nos. 13-1265, 13-1267, 13-1268 (argued Apr. 7, 2014).

As a result of EPA's refusal to alter the volume requirements, RIN prices increased dramatically and have since exhibited extreme volatility. Those conditions result in a windfall for large integrated refiners and other blenders, which can sell RINs separated through blending non-renewable fuel volumes on which they are not obligated, and an extreme hardship for small refineries, which must purchase RINs from blenders to comply.

## C. Small refinery hardship relief

1. Congress recognized that the renewable fuel standards had the potential to impose a particularly severe hardship on small refineries that cannot blend renewable fuel into their petroleum products. Congress therefore exempted small refineries from compliance until 2011, and it directed the Department of Energy to conduct a study "to de-

termine whether compliance . . . would impose a disproportionate economic hardship on small refineries" after that time. 42 U.S.C. § 7545(o)(9)(A)(ii)(I); *see id.* § 7545(o)(1)(K) (defining a "small refinery" as one that processes, on average, less than 75,000 barrels of crude oil per day). If DOE found that a small refinery would be subject to a disproportionate economic hardship, EPA was to extend its exemption from compliance for an additional two years. 42 U.S.C. § 7545(o)(9)(A)(ii)(II).

In addition, Congress provided that a small refinery could petition EPA "at any time" for an extension of its exemption "for the reason of disproportionate economic hardship." 42 U.S.C. § 7545(o)(9)(B)(i). In evaluating such a petition, the agency must consider the findings of the DOE study "and other economic factors." *Id.* § 7545(o)(9)(B)(ii). EPA is required to act on such a petition within 90 days of receiving it. *Id.* § 7545(o)(9)(B)(iii); *see also* 40 C.F.R. § 80.1141(e).

2. In 2009, DOE issued its first attempt at the required study, concluding "that the market for [RINs] was competitive, [that there was] no reason to believe that a competitive market would dispropor-

tionately disadvantage participants who purchase credits rather than generating them through blending renewable fuels into their products," and that the exemption for small refineries should not be extended. J.A. 20; *see also id.* at 24-25. Congress, however, determined that DOE's study "contained inadequate small refinery input [and] did not assess the economic condition of the small refining sector, take into account regional factors or accurately project [renewable fuel standard] compliance costs." S. Rep. No. 111-45, at 109 (2009). In particular, Congress noted that the price of RINs had recently increased. The Senate Appropriations Committee and the Conference Committee therefore directed DOE to conduct a new study and, among other things, to "reassess the accuracy of small refinery compliance costs through the purchase of renewable fuel credits." *Id.*; H.R. Rep. No. 111-278, at 126 (2009).

3. In March 2011, DOE released its updated Small Refinery Exemption Study. J.A. 14. In the new study, DOE acknowledged that "[i]f certain small refineries must purchase RINs that are far more expensive than those that may be generated through blending, this will lead to disproportionate economic hardship for those effected entities." J.A.

25. DOE developed metrics to evaluate the disproportionate economic hardship of small refinery compliance. Specifically, it adopted what it called a "scoring matrix" comprising two sections—one incorporating scores "for disproportionate structural and economic weightings," and one assessing "the impact of compliance with the [renewable fuel standard] on the viability of the firm." *Id.* at 55.

The "disproportionate structural impact metrics" measure access to credit, the availability of other business lines that might smooth the firms' cash flows, local market acceptance of renewable fuels, the firm's percentage of diesel production, and the effect of state regulations. *Id.* at 56. The "disproportionate economic impact metrics" evaluate the firm's relative refining margin, the degree to which the refiner can actively blend renewable fuels, whether the firm is in a niche market, and whether RINs are a net cost or a net source of revenue. *Id.* A refinery is assigned a score from zero to ten for each of those nine individual metrics. The metrics are weighed equally to derive a disproportionate impact index, which is then scaled from zero to five. *Id.*

Separately, three "viability metrics" are evaluated. J.A. 59. In the 2011 report, DOE looked at three factors: (1) whether the cost of com-

pliance "would reduce the profitability of the firm enough to impair future efficiency improvements," (2) whether "individual special events" have had "a temporary negative impact on the ability of the refinery to comply," and (3) whether compliance costs are "likely to lead to shutdown" of the refinery. *Id.* The three viability metrics are each given a score of either zero or ten; the scores are equally weighted; and the combined score is scaled to a range of zero to five. *Id.* at 55-56.

If both the disproportionate-impact score and the viability score are greater than one, the Department's methodology produces a finding of disproportionate economic hardship. J.A. 60. Such a finding, the Department explained, "requires a score equivalent to at least four of the eight metrics for disproportionate impact at the moderate level (5), and a positive value for at least one of the three metrics for the viability index." *Id.*[1]

## II.   Wyoming Refining Company

Wyoming Refining Company ("WRC") owns and operates a refinery in Newcastle, Wyoming. The refinery is very small: it processes

---

[1] DOE referred to "eight" disproportionate impact metrics, J.A. 55, 60, but there are actually nine, *id.* at 56.

MATERIAL UNDER SEAL DELETED

14,000 barrels of crude oil per day, accounting for 0.08% of the nation's refining capacity of 17.8 million barrels per day and placing it 117th in daily throughput among the 132 refineries in the United States. J.A. 116. The refinery employs about 110 people and is the largest employer in Newcastle. *Id.*

The refinery's primary market ██████████████████████████ ███████████. Its products pipeline is connected to the third-party Rocky Mountain Pipeline, which delivers to Rapid City, South Dakota. Gasoline and diesel are sold from the pipeline terminal in Rapid City. The refinery also markets jet fuel to Ellsworth Air Force Base in South Dakota. Military jet fuel is transported by the Rocky Mountain Pipeline to Rapid City and then delivered to Ellsworth by another pipeline. J.A. 116.

WRC produces about ████ barrels per day of gasoline. It sells about ████ barrels per day directly from the refinery, and it ships ████ barrels per day of gasoline through the Rocky Mountain Pipeline to Rapid City. Of the gasoline shipped through the pipeline, ████ barrels per day are transferred to large, vertically integrated refiners that market to contracted and branded retail outlets. These sales or

MATERIAL UNDER SEAL DELETED

exchanges of gasoline occur inside the Rapid City pipeline terminal before any blending can occur. WRC thus has no opportunity to blend renewable fuels into that portion of its gasoline because the pipeline cannot carry blended fuel. Instead, WRC's customer blenders—which are also WRC's competitors—blend its gasoline with ethanol, thus separating RINs free of any associated compliance obligation. WRC sells the remaining ███ barrels per day of pipeline gasoline to retailers and "jobbers," or marketers and blends much of this gasoline at the Rapid City pipeline terminal loading rack. J.A. 116-117.

WRC produces about ███ barrels per day of diesel fuel and sells about ███ barrels per day of diesel directly from Newcastle. Biodiesel cannot be blended at Newcastle because the nearest producer is about 450 miles from the refinery. The remaining diesel production is shipped to Rapid City through the Rocky Mountain Pipeline. Biofuel cannot be blended into this diesel fuel before pipeline shipment, and because the pipeline terminal in Rapid City does not have biodiesel blending facilities, there is no opportunity for blending diesel after it arrives at Rapid City. J.A. 117.

MATERIAL UNDER SEAL DELETED

## III. WRC's petition for a disproportionate-hardship exemption

Based on the hardship scoring in DOE's Small Refinery Study, WRC was granted hardship relief for 2011 and 2012. J.A. 114. In August 2013, within days of EPA's final 2013 rule, the company applied for hardship relief for 2013 and 2014. *Id.* As the company explained, "the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ . . . compliance obligation has not improved and, in fact, has become significantly worse." *Id.* Specifically, the company stated that ▮▮▮▮▮▮▮▮▮▮ are caused by the skyrocketing price of RINs, by a significantly impaired ability to blend biofuels due to market factors, by transportation restrictions and geographic isolation, and by competing refiners' severe discounting of prices in an effort to convert the Rapid City, South Dakota conventional clear gasoline market to renewable fuels." *Id.*

WRC noted that pipeline restrictions prevent it from blending much of its production, meaning that it is required to purchase RINs for compliance, and that its obligation to purchase RINs would exceed ▮▮▮▮▮▮ RINs in 2013 and ▮▮▮▮▮▮ RINs in 2014, which, at prices on the date of the petition, would cost ▮▮▮▮▮▮ in each year. J.A.

MATERIAL UNDER SEAL DELETED

115. The company explained that the cost of RINs would place it █

████████████████████████████████████████████████. *Id.*

## IV.   EPA's rejection of WRC's petition

While the statutory deadline for EPA to act on WRC's petition was November 13, 2013, *see* 42 U.S.C. § 7545(o)(9)(B)(iii), EPA did not act until January 31, 2014. J.A. 13. In its order, EPA denied the petition for an extension of small refinery hardship relief, thus requiring WRC to meet obligations associated with production beginning over a year earlier, on January 1, 2013. Despite the disproportionate economic impact of RIN prices caused by the dysfunctional RIN market, EPA found that no "circumstances exist that impose disproportionate economic hardship on the refinery." *Id.*

Appended to the order was a memorandum explaining EPA's decision. J.A. 316. The memorandum evaluated the company's application using the metrics set out in the DOE Small Refinery Study. EPA adopted DOE's calculation that WRC had a disproportionate impact score of ██, enough to qualify for relief, but a viability score of only ██, which was not enough. The viability score was based on a component score of 5 for "compliance cost eliminates efficiency gains" and

component scores of 0 for "individual special events" and "compliance costs likely to lead to shutdown." *Id.* at 330.

In the 2011 published Small Refinery Study, the score for "compliance costs eliminates efficiency gains" had been required to be either 0 or 10: "0 = no impact on efficiency," while "10 = impact on efficiency." *Id.* at 59. In rejecting WRC's 2013 application, EPA stated that, "[s]ubsequent to publication of DOE's small refinery report, DOE has added intermediate scores (5 instead of 0 or 10) as a possibility in 2 of the 3 metrics for the viability index," including compliance costs. *Id.* at 321 n.4. Neither DOE nor EPA had given any public notice of that change, and neither agency gave an explanation for it. Yet the change was outcome determinative—had WRC scored a 10 in that category, it would have had a high enough viability score to qualify for relief.

EPA went on to "qualitatively review[] the information submitted by WRC to ascertain if the information is consistent with the finding of no disproportionate economic hardship that results from application of the DOE methodology." J.A. 331. In so doing, it concluded that "the information is indeed consistent with that finding." *Id.* Specifically,

MATERIAL UNDER SEAL DELETED

EPA stated that WRC had been "profitable enough to afford the cost of . . . compliance in 2013 without significantly impacting refinery viability." *Id.* In reaching that conclusion, it noted that WRC had paid a discretionary dividend in 2012. *Id.* EPA acknowledged that WRC had ███████████████████████ in 2013, but it said that "[r]efining is a cyclical business," and it expected WRC to be profitable in 2013, "even if they are not profitable enough ███████████████." *Id.* at 332. It concluded by stating that "sufficient funds are available for . . . compliance in 2013." *Id.*

## SUMMARY OF ARGUMENT

Recognizing that the renewable fuel standards could impose a hardship on small refineries out of proportion to that imposed on their larger competitors, Congress authorized EPA to grant exemptions from those standards to small refineries "for the reason of disproportionate economic hardship." 42 U.S.C. § 7545(o)(9)(B)(i). WRC amply demonstrated that it faces disproportionate economic hardship, and EPA acted arbitrarily and capriciously in denying WRC's petition for relief.

EPA's principal basis for denying the petition was its conclusion that WRC had failed to demonstrate that compliance would impair its

- 20 -

viability. But the statute directs the agency to grant a petition in a case of "disproportionate economic hardship," whether or not that hardship is viability-impairing. EPA erred by introducing—and, in this case, giving dispositive weight to—a factor that Congress did not make relevant. Moreover, while the agency had previously applied a viability test, it altered the way it applied that test in this case. The agency's change in policy made the test much more difficult to satisfy, and EPA made that change without giving any notice or explanation.

Even aside from EPA's erroneous decision to focus on a changed understanding of viability, EPA's decision was arbitrary because it did not adequately take account of the fact that, while many of WRC's competitors can comply by blending renewable fuel into gasoline, WRC lacks the ability to comply except by purchasing RINs. That fact puts WRC at a competitive disadvantage, a disadvantage worsened by the dysfunctional RIN market. EPA failed to acknowledge either the extent of WRC's dependence on the RIN market or the effect of the dysfunction in that market.

EPA also acted arbitrarily in basing its decision, in part, on WRC's decision to pay a dividend in 2012. According to the agency,

MATERIAL UNDER SEAL DELETED

WRC should instead have saved the money it paid out to use for regulatory compliance. But at the time WRC paid the dividend, EPA had not yet promulgated, or even proposed, the standard from which WRC later sought an exemption. Nor did WRC have any reason to anticipate the adverse market effects of that standard, which EPA itself did not anticipate.

Finally, EPA erred in assessing WRC's financial condition. EPA failed to account for losses and gains due to hedges, a standard practice in the refining industry. It looked to WRC's net income in assessing the company's viability, ignoring the company's ▇▇▇▇▇▇▇. And in measuring WRC's net income, it made a simple arithmetic error, while failing to account for taxes. Those errors undermine the agency's rationale for denying WRC's petition for relief.

## STANDING

WRC is directly regulated by the order at issue here and therefore has standing to challenge it. *See Am. Trucking Ass'ns, Inc.* v. *Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013) ("'[T]here is ordinarily little question' of injury, causation, and redress when 'the plaintiff is himself an object of the action (or forgone action)

at issue.'") (quoting *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992)), *cert. denied sub nom. Trescott* v. *Fed. Motor Carrier Safety Admin.*, 134 S. Ct. 914 (2014).

## STANDARD OF REVIEW

The Court must set aside an agency's order if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To satisfy that standard, the agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted). The Court does not defer to the agency's "conclusory or unsupported suppositions." *McDonnell Douglas Corp.* v. *U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004).

## ARGUMENT

## I.    EPA acted arbitrarily in denying hardship relief on the ground that regulatory compliance would not impair WRC's viability

EPA's decision turned on its determination that compliance with the renewable fuel standards would not affect WRC's viability. As discussed below, EPA's factual and analytical errors make that conclu-

sion flawed on its own terms. But more fundamentally, viability is not a relevant factor under the statute, and the agency erred in assigning it dispositive weight. In addition, having chosen to look to viability, the agency erred by changing its approach to assessing viability so as to make the viability test much harder to pass, and, futhermore, did so without giving notice or offering a reasoned explanation for its change.

### A.  EPA's focus on viability is contrary to the statutory language

Congress has provided that "[a] small refinery may at any time petition [EPA] for an extension of the exemption" from the renewable fuel standard "for the reason of disproportionate economic hardship." 42 U.S.C. § 7545(o)(9)(B)(i). EPA correctly recognized that "[t]he basis for any grant of an exemption extension by EPA in response to an individual petition is the same as the basis of evaluation in the DOE study—disproportionate economic hardship." J.A. 322. EPA acknowledged what the text of the statute makes plain: the agency is to grant exemptions when a small refinery faces disproportionate economic hardship—that is, a hardship that is out of proportion to that faced by larger refineries.

In applying the statute to WRC's application, however, EPA departed from that principle. The agency began on a sound footing by examining factors that would help it identify "conditions likely to lead to disproportionate economic hardship." J.A. 321. But it then went on to examine three *other* factors that were not tied to disproportionate economic hardship. It used those factors to derive a "viability index," and it said that it would refuse to grant an exemption unless both the disproportionate-impact index and the viability index were greater than a threshold value. *Id.* When it "qualitatively reviewed the information submitted by WRC," it repeated its focus on viability, emphasizing that "WRC has been profitable enough to afford the cost of . . . compliance in 2013 without significantly impacting refinery viability." *Id.* at 331.

Nothing in the statute identifies "viability" as a factor that the agency should consider in assessing whether a refinery has demonstrated disproportionate hardship. The statute calls for an inquiry into whether the hardship faced by a small refinery is proportionate or disproportionate to that faced by other refineries. Impairment of the

applicant's viability is neither necessary nor relevant to establishing that the hardship it faces is disproportionate.

In effect, EPA has transformed a statutory exemption aimed at preventing disproportionate hardship into one limited to preventing viability-impairing hardship; where Congress sought to preserve the industry's competitive balance, EPA concerned itself only with a petitioner's internal finances. Even had the agency attempted to justify that transformation as an interpretation of the statute—which it did not—the interpretation would fail at step one of *Chevron* because it is contrary to the language that Congress employed, which is "disproportionate economic hardship." *See Chevron U.S.A. Inc.* v. *NRDC*, 467 U.S. 837, 843 (1984).

At the very least, the agency's interpretation is unreasonable and should be rejected at *Chevron* step two because it involves the consideration of a factor Congress did not intend the agency to consider. *See Agape Church, Inc.* v. *FCC*, 738 F.3d 397, 410 (D.C. Cir. 2013) ("The analysis of disputed agency action under *Chevron* Step Two and arbitrary and capricious review is often 'the same, because under *Chevron* step two, [the court asks] whether an agency interpretation is arbi-

trary or capricious in substance.'") (quoting *Judulang* v. *Holder*, 132 S. Ct. 476, 483 n.7 (2011)) (brackets in original); *State Farm*, 463 U.S. at 43 (agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider"). That is apparent from the statutory text: had Congress wished to limit relief to those refineries that might be put out of business by having to comply with the renewable fuel standard, it could easily have chosen more appropriate language than that of Section 7545(o)(9)(B)(i). Indeed, Congress used such language elsewhere in the Clean Air Act. *See*, *e.g.*, 42 U.S.C. § 7419(d)(2) (permitting waiver of certain requirements "upon a showing by the owner or operator of the smelter that such requirement would be so costly as to necessitate permanent or prolonged temporary cessation of operations"); *Kennecott Corp.* v. *EPA*, 684 F.2d 1007, 1014 (D.C. Cir. 1982) ("Congress' election to employ 'cessation' in § 119(d)(2), and to employ the distinctly different standard 'reasonably available' in § 119(b)(3), is strong evidence that Congress intended application of something less than a 'closure' test in determining eligibility . . . under § 119(b)(3).").

The statute's history reinforces that conclusion. After DOE completed its initial study of small refineries in 2009—a study that recommended against extending the exemption for small refineries—Congress determined that DOE's study "contained inadequate small refinery input [and] did not assess the economic condition of the small refining sector, take into account regional factors or accurately project [renewable fuel standard] compliance costs." S. Rep. No. 111-45, at 109. The Senate Appropriations Committee and the Conference Committee directed DOE to conduct a new study and to "assess . . . compliance impacts on small refinery utilization rates and profitability, evaluate the financial health and ability of small refineries to meet [renewable fuel standard] requirements, study small refinery impacts and regional dynamics by [region], and reassess the accuracy of small refinery compliance costs through the purchase of renewable fuel credits." *Id.*; H.R. Rep. No. 111-278, at 126. Nowhere did Congress suggest that refinery viability was an appropriate factor to consider or that it was concerned that small refineries would face a threat to their viability, as opposed to merely competitive disadvantage. Nor is it plausible that, having directed DOE to conduct a new study because its first one

was too parsimonious in granting relief, Congress would have wanted EPA to limit relief to those few refineries suffering severe, viability-impairing hardship. EPA therefore erred in demanding that WRC demonstrate that compliance with the regulatory mandate would impair its viability.

### B. EPA failed to explain or give notice of the change in its method of assessing viability

Even if it were appropriate for the agency to require such a demonstration, EPA acted arbitrarily in changing the way it assessed viability. Under the methodology set out in DOE's Small Refinery Study, which EPA adopted, the "viability metric" incorporated three component scores, each of which could have a value of either 0 (unlikely) or 10 (likely): whether the refinery would have to eliminate efficiency gains if it had to comply; whether the refinery had suffered a special event, such as an accident, causing economic damage; and whether compliance would be likely to lead to refinery shutdown. J.A. 337. To obtain the final score, the three component scores are added together, and the total is divided by 6, with a score of greater than 1 being necessary to obtain relief. *Id.* at 330-331. Accordingly, a score of 10 on any component would be sufficient for relief (because $10 \div 6 \approx$

1.7). As a practical matter, the "efficiency" component of the viability test is even more important than the arithmetic indicates. By their nature, the "special event" and "shutdown" tests will apply only to a small number of refineries in circumstances that clearly justify relief. It is the "efficiency" test that does the work of applying the test to the majority of petitioners.

In the Small Refinery Study, the score for "compliance costs eliminates efficiency gains" had been required to be either 0 or 10: "0 = no impact on efficiency," while "10 = impact on efficiency." *Id.* at 59. In the order under review, however, EPA assigned WRC a 5 for that component. *Id.* at 330. By way of explanation, EPA said only that DOE "already used intermediate scores of 5 in some of the disproportionate structural and economic metrics, and believes it is also appropriate to use intermediate scores in [the compliance cost metric] to more accurately characterize the impacts of compliance costs." *Id.* at 320. But that is no explanation at all. It is tautological that allowing three possible scores (0, 5, or 10) will permit a more precise description of the variable being measured than will two possible scores (0 or 10). But the entire scoring matrix was designed around the premise that

- 30 -

the efficiency-impact score would be either a 0 or a 10, with 10 representing "impact on efficiency." If some "impact on efficiency" is no longer sufficient for a 10, then it will be much more difficult to qualify for hardship relief—indeed, the change was outcome-determinative in this case because WRC received only a 5 but would have qualified for relief had it received a 10 (as it would have under the old system).

The addition of a 5 as a possible score thus represents a significant change in policy because it gives real effect to the "viability" test, which is not grounded in the statute. In conducting the 2011 Small Refinery Study, DOE recognized that it was required to seek comment from small refineries. J.A. 25. In altering the application of the study's methodology, EPA should also have provided notice and an opportunity to comment. EPA acted unlawfully in imposing the change without any opportunity for comment and without any semblance of an explanation. *See Shieldalloy Metallurgical Corp.* v. *NRC*, 624 F.3d 489, 493 (D.C. Cir. 2010) (agency is obligated "to explain any important changes of policy or legal interpretation").

## II. EPA failed to take account of the dysfunctional market for RINs

In evaluating WRC's application for small refinery hardship relief, EPA failed to consider a critical issue that Congress, DOE, and EPA itself have identified as one of the "key factors in determining disproportionate economic hardship from compliance": the high cost of purchasing RINs relative to producing them by blending. J.A. 25. That unexplained omission rendered EPA's decision arbitrary and capricious. *State Farm*, 463 U.S. at 42-43 ("Normally, an agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem[.]").

### A. High RIN prices exacerbate the disproportionate hardship inflicted on small merchant refineries that must purchase RINs

As a small merchant refinery, WRC lacks the capacity to comply with the renewable fuel standard solely by blending renewable fuel with the petroleum blendstock it refines. Instead, WRC must purchase RINs. By contrast, large refiners, against which WRC competes, are vertically integrated, meaning that they or their corporate affiliates own blending infrastructure and can comply by blending rather than purchasing RINs. In fact, these large refiners and other blenders gen-

erate and sell excess RINs from blending gasoline produced by merchant refiners like WRC, which retain the associated renewable volume obligation. *See* J.A. 46 (discussing differences between large, integrated refiners and small merchant refiners); *id.* at 275 (explaining limits on WRC's ability to comply by blending).

When the RIN trading system works as intended, RIN prices should be comparable to blending costs. *See* 2010 Rule, 75 Fed. Reg. at 14,670, 14,722. In that situation, the cost of compliance on obligated volumes would be the same for refiners who comply by blending their own fuel and those who comply by purchasing RINs. Even then, however, there is a disproportionate economic hardship on small refineries.

Although the cost of compliance on obligated volumes would be the same for all refiners, integrated refiners and blenders also blend and sell volumes on which they are not obligated and, therefore, have no compliance cost. Those volumes are produced by merchant refiners who can transfer the volumes but not the compliance obligation on that petroleum production. In that situation, the blender successfully transfers all blending cost on the small refinery's obligated volumes by selling the RIN that the small refinery must buy, and, thus, the blend-

er markets blended fuel for which the blending cost is zero. Conversely, the small refinery remains obligated on all of its production and markets only a portion of it. The volume the small refinery does market must bear its own blending cost plus that transferred from the blender. That creates a competitive imbalance by which the blender markets product for which the compliance cost is zero, and the small refinery markets product for which the compliance cost is out of proportion to the volume marketed. The blender has no blending cost risk because the small and merchant refiners must buy the blenders' RINs.

In addition, and as Congress has recognized, the RIN market does not always function as intended. Congress directed DOE to reconsider its initial Small Refinery Exemption Study because DOE had not adequately evaluated "small refinery compliance costs through the purchase of renewable fuel credits." S. Rep. No. 111-45, at 109 (2009). More specifically, "Congress direct[ed] DOE to . . . [r]eassess whether small refinery compliance costs through the purchase of RINs is similar to the cost of compliance by purchasing and blending renewable fuels," implicitly suggesting that a disparate economic impact would constitute disproportionate hardship. J.A. 25.

In response to that congressional directive, DOE acknowledged that in some situations, the RIN market can become illiquid and RINs scarce, causing RIN prices to increase and "increasing the cost of compliance more for refineries that rely on RINs for compliance compared to those that do not." J.A. 25. "These circumstances," DOE explained "include both increases in the costs of renewable fuels and the inability to blend all of the mandated renewable fuel into conventional transportation fuels (the so-called blend wall)." *Id.*

When purchasing RINs is significantly more costly than generating them by blending, small merchant refiners like WRC suffer particularly disproportionate economic hardship. J.A. 25 ("If certain small refineries must purchase RINs that are far more expensive than those that may be generated through blending, this will lead to disproportionate economic hardship for those affected entities."). The surplus blenders—including large, integrated refiners against which WRC competes—can achieve compliance at a relatively low cost by blending renewable fuel to obtain RINs, while WRC is forced to purchase RINs from its competitors at inflated prices. That is a significant source of disproportionate hardship.

**B.    RIN prices are far higher than the cost of blending**

Since early 2013, RIN prices have been far higher than the cost of obtaining RINs by blending renewable fuel.  That is because, beginning in 2013, statutory renewable fuel volume requirements exceeded the transportation market's ability to consume renewable fuel. In its 2013 Rule, EPA acknowledged that it had hit the blendwall—that is, the economy-wide limit on the consumption of renewable fuel, imposed by the inability of most automobile engines to burn gasoline containing more than 10% ethanol—but it nevertheless set the 2013 volume requirements in excess of what the market could consume. 2013 Rule, 78 Fed. Reg. at 49,822 (noting "that the 14.5 [billion gallons] of ethanol that might need to be consumed in 2013" would be "1.4 [billion gallons] above the E10 blendwall").

Even though ethanol remained cheaper than gasoline, so that RIN prices should have been near zero, RIN prices increased dramatically, spiking from approximately 5¢ per RIN in early January 2013 to approximately 70¢ by March 2013. 2013 Rule, 78 Fed. Reg. at 49,822 & n.73. Between January 2013 and April 2014, they have averaged 56¢, far higher than their historical price of 2-5¢. Those conditions create a

disproportionate hardship for refiners that cannot blend and must rely on the RIN market to comply.

### C. EPA did not adequately consider the effect of WRC's obligation to purchase RINs

In denying WRC's petition for small refinery hardship relief, EPA did not analyze the disproportionate economic hardship that WRC would suffer as a result of the high cost of buying RINs compared to the cost of generating them. Nowhere in its decision did EPA compare the cost of the two compliance pathways and assess the disproportionate impact of the disconnect between them.

1. To the extent EPA discussed the issue at all, its discussion reflected an inaccurate measurement of costs. When WRC submitted its hardship application, RIN prices were approximately $1.06. J.A. 118. When WRC purchased RINs in 2013, prices averaged approximately 80¢. *Id.* at 332. Rather than cherry-picking prices at a particular time, WRC's petition for hardship relief relied on average RIN prices. *Id.* at 143.

At the time EPA issued its decision denying WRC's application, however, prices had temporarily dropped to between 30¢ and 40¢, and EPA appears to have used RIN prices of only 30¢ and 40¢ to calculate

WRC's hardship. *Id.* at 327-328, 332. In other words, EPA simply ignored its own observation that "RIN prices have been extremely volatile." *Id.* at 328 n.13); *see also id.* at 244 (EPA email conceding that "the combined volatility of RIN prices and refining margins has caused my management to realize that it's very difficult to forecast the future"); *id.* at 277 (EPA email noting that "RIN prices . . . fluctuate on a daily basis"). As noted, RIN prices have averaged approximately 56¢ since January 2013, nearly double what they were when EPA denied WRC's petition and far beyond the 2¢ premium that DOE called "moderate" in 2011. *Id.* at 26. EPA acted unreasonably in ignoring the competitive imbalance embedded in the RIN system and in assuming that the price of RINs at the time of its decision would be a good measure of compliance costs over the course of the year.

EPA pointed to one reason to believe that price volatility might decrease: it stated that "the proposed 2014 standards . . . appear[] to have alleviated concerns among obligated parties that insufficient RINs would be readily available for overall industry compliance in 2013 and 2014." J.A. 328 n.13. But that speculation failed to account for the fact that a substantial number of RINs generated in 2013 and

2014 would be carried over by RIN holders into the following years and therefore would not be available for compliance.[2]

2. EPA's failure of explanation and analysis is illustrated by DOE's scoring matrix for WRC, which left a blank space for metric 2(d)—"RINs net revenue or cost." J.A. 330. In a footnote, EPA attempted to justify that omission on the basis of a "lack of consistency among participants in DOE's small refinery survey in 2010." *Id.* But that rationale cannot be squared with the agency's own recognition that disproportionate economic hardship must be determined on a refiner-by-refiner basis, *see id.* at 320 ("Given this Congressional direction, this study needed to consider the unique factors contributing to disproportionate economic hardship for individual small refineries in the study." (quoting *id.* at 25). Moreover, by its own terms, that justification applies only to participants surveyed in 2010, when RIN prices were equal to the cost of blending. *See id.* at 56 (In 2011, DOE observed that the unevaluated metrics "should be maintained as part of the matrix for use in the future when other renewable fuels become

---

[2] That failure of the 2013 rule is one subject of petitions for review currently pending before this Court. *See Monroe Energy, LLC* v. *EPA*, Nos. 13-1265, 13-1267, 13-1268 (argued Apr. 7, 2014).

commercially available"). It does not apply to market conditions today, when RIN prices remain far higher than the cost of blending renewable fuel. Neither DOE nor EPA explained the omission of this key measure of disproportionate economic hardship in their analysis of WRC's hardship application.

Similarly, EPA failed to take account of the effect of WRC's diesel production on WRC's need to purchase RINs. While the agency did acknowledge that WRC has a higher diesel production than the industry average, J.A. 330, it failed to give any score to WRC for the extremely low "local market acceptance of biodiesel" (metric 1(C)(iii)) or its nonexistent "biodiesel blending as a percentage of production" (metric 2(b)(iii)). But all of those factors mean that WRC could not achieve compliance by blending even if it had the infrastructure to do so, and that it is therefore dependent on purchasing RINs.

Those omissions were not harmless. Even though the metrics that EPA failed to score pertained to the disproportionate impact scoring, which WRC satisfied, they still affected EPA's analysis. Had EPA analyzed the factors that it improperly ignored in the matrix, those factors would also have informed its analysis of viability—and espe-

cially of the "compliance cost eliminates efficiency gains" metric. The agency cannot understand the effect of compliance on a refinery's viability without properly understanding the economic impact of compliance. But even if it could, EPA also conducted a qualitative analysis, and that analysis should have taken account of the practical necessity for WRC to buy RINs in order to comply.

3. EPA's failure to account for high RIN costs, like much of its analysis, appears to have rested on the view that because WRC had previously received a high score on the "compliance cost eliminates efficiency gain" component of the viability metric, it could not continue to do so. EPA cited the view, expressed by DOE in 2010, that "refineries that currently (i.e., in 2010) score high in this category and receive an extension (which WRC did) will likely see a reduction in the scoring of this category in the future." J.A. 330 n.20. That was not a statement of policy, but a factual prediction. And EPA ignored the reason that DOE gave for its prediction: "Refineries that receive an extension of their exemption *and do some blending*, could sell RINs to improve their ability to position themselves to economically comply with [the renewable fuel standard] (through capital expenditures for blending or

increasing capital for a RIN purchase program), thus reducing the impact of their future . . . compliance." *Id.* at 59 (emphasis added). As explained above, that rationale does not apply to WRC, which is limited in its ability to blend fuel and must absorb the blending costs of others and compete against a product that is lower cost because its blending cost is zero.

More to the point, whatever logic DOE's prediction might have had in 2010, it does not make sense now in light of the dysfunctional RIN market that subjects small refiners like WRC to a competitive disadvantage as compared to blenders, including large, vertically integrated refiners. The mere passage of time will not lessen that disadvantage—or the disproportionate hardship it imposes. In stubbornly insisting that WRC should receive a lower score than it had in the past, without regard to the reality of its current situation, EPA acted arbitrarily.

## III. EPA acted arbitrarily in basing its decision on WRC's issuance of a dividend in 2012

One of EPA's rationales for denying WRC's application was that WRC "perceived that sufficient funds were available in 2012 for it to make a substantial discretionary dividend payment; money which

could have been spent on efficiency improvements or banked for future RFS compliance." J.A. 322; *see id.* at 331. WRC's dividend was central to EPA's reasoning: although EPA did not expressly discuss it in applying the DOE scoring matrix, the agency mentioned it twice in its four-paragraph qualitative analysis. *Id.* at 331-332. EPA's reasoning was flawed.

As an initial matter, that WRC paid a dividend in 2012 has little relevance to whether it would face a disproportionate economic hardship from regulatory compliance in 2013. The question before EPA was whether WRC would face disproportionate economic hardship in the real world, not whether it would have faced disproportionate economic hardship in a hypothetical world in which it had acted differently in the past.

In any event, there is a strange irony in EPA's criticism of WRC for failing to prepare in 2012 for the dramatic increase in RIN prices that occurred during 2013: EPA itself failed to anticipate the magnitude of the increase, even though EPA knew it was breaching the blendwall and could have avoided it by exercising its statutory waiver authority. In 2012, WRC decided to pay a dividend based on its cumu-

lative positive financial condition over the course of the previous years. The dividend represented about 15% of accumulated earnings through the third quarter of 2012. In deciding to pay a dividend after not having done so the year before, WRC concluded that it had reserved sufficient cash for planned capital improvements and other expenditures, including compliance with the renewable fuel standard. J.A. 140 ("Discretionary distributions made in 2012 were reasonable and justified in light of the Company's cash balance and other known and foreseeable facts at the time the discretionary distributions were made."). WRC reasonably relied on EPA's repeated public commitments to ensure that the RIN market would continue to function properly, providing a ready means of economical compliance at a cost comparable to that of blending. *See, e.g.*, 2010 Rule, 75 Fed. Reg. at 14,722 (promising that "the market will provide opportunities for parties who are in need of RINs to acquire them from parties who have excess"); 2007 Rule, 72 Fed. Reg. at 23,904 ("[T]rading mechanisms [will] ensure that the means to demonstrate compliance will be readily available for use by obligated parties.").

MATERIAL UNDER SEAL DELETED

In 2013, however, RIN prices increased dramatically from historic prices because EPA set 2013 volume requirements eight months late and in excess of the blendwall. Because WRC had no way to foresee the increase in compliance costs, EPA cannot reasonably characterize WRC's business decision to issue a dividend in 2012 as evidence that compliance with 2013 and 2014 standards would not cause WRC disproportionate economic hardship.

It was similarly unreasonable for EPA to fault WRC for issuing a dividend in 2012 rather than planning to comply with 2013 renewable fuel standards, when EPA did not even propose the 2013 standards until months *after* WRC issued its dividend, and it did not finalize the rule until August 2013, more than eight months after the statutory deadline. *See* 42 U.S.C. § 7545(o)(3)(B)(i) (requiring EPA to determine and publish each year's renewable fuel standard by "[n]ot later than November 30" of the preceding year). For one thing, contrary to EPA's view, WRC did invest in blending infrastructure.[3] More importantly,

---

[3] WRC's blending capacity became fully operational in October 2013. J.A. 324 n.6. And even with that capacity operational, WRC will still be prevented from blending about ▉ of its obligated gasoline and 100% of its diesel production because of pipeline restrictions, geographic isolation, and a lack of custody of its obligated production at the renew-

EPA's disregard of the statutory deadline deprived WRC of statutorily required lead time to plan for compliance, including by deciding whether to issue a dividend and in what amount. As this Court has observed, when "Congress create[s] a specific deadline in order to provide the industry with . . . leadtime," agency delay can be "detrimental to industry compliance with the standards" because industry "cannot plan ahead and ensure compliance with the standard until it is issued." *In re Ctr. for Auto Safety*, 793 F.2d 1346, 1353-54 (D.C. Cir. 1986). That is precisely what happened here.[4]

Under the circumstances, faulting WRC for issuing a dividend in 2012 rather than planning to comply with requirements that EPA had not made known was unreasonable and arbitrary and capricious. *See,*

---

able fuel blending point. *Id.* at 275; *see id.* at 323-324. Given the lack of demand for renewable fuel in local markets, investing more money in costly blending infrastructure would not have made complying with the standard in 2013 and 2014 any easier for WRC.

[4] In fact, EPA further undermined WRC's ability to plan for compliance by not acting on WRC's application for hardship relief until January 31, 2014, more than two months after EPA's 90-day statutory deadline to act had run. J.A. 284, 286 (explaining the hardship caused by EPA's delay in processing WRC's application). When EPA finally acted, it directed WRC to comply with renewable volume obligations associated with WRC's gasoline and diesel production since the beginning of 2013, a calendar year that had already ended. *Id.* at 13.

*AEP Tex. N. Co.* v. *STB*, 609 F.3d 432, 441 (D.C. Cir. 2010) (finding an agency decision arbitrary and capricious because the agency did not consider whether a regulated entity reasonably could have planned for compliance when its ability to plan reliably was undermined by the agency itself). EPA cannot fault WRC for a lack of clairvoyance about a rulemaking that had not yet occurred, that EPA unreasonably delayed, and that caused a market reaction that caught EPA itself by surprise.

## IV.  EPA erred in assessing WRC's financial condition

EPA's decision must be set aside for the independent reason that EPA made four critical errors in assessing WRC's financial condition. Those errors undermine the agency's rationales for denying WRC's application for hardship relief.

1. EPA erred in determining WRC's net refining margins because it failed to account for realized hedge impacts. Hedges are a common business practice designed to reduce the risk associated with volatile refining profit margins.  *See* J.A. 142 (explaining that "[h]edging is used heavily in the refining industry, especially by independent refiners," and is often required by lenders); *id.* at 201-202 (explaining the value of hedging); *see also id.* at 142, 150-152, 201-202 (explaining why

- 47 -

MATERIAL UNDER SEAL DELETED

WRC's decision to hedge in ████ was a prudent business decision at the time). In this case, the hedge was created by taking positions in crude oil and refined products such that, if refining margins fell below expectations, the hedge positions would show a profit. Conversely, if margins exceeded expectations, the hedge would show a payable loss. In short, in exchange for protection against low refining margins, the hedge took away the upside of high margins. Hedge gains and losses are reconciled periodically and are payable at that time. These are known as realized gains and losses. Swings in the underlying hedge positions before they are payable are known as unrealized gains and losses, which must be reported for financial purposes, but which do not affect a refiner's cash position. Realized hedge gains and losses have direct impacts on a refiner's profit margin, income, taxes, and cash flow, and thus on its operations and ability to comply with the renewable fuel standard.

In assessing WRC's net refining margins, however, EPA did not account for realized hedge impacts; in fact, it applied "adjustments . . . to eliminate losses or gains from financial hedges." J.A. 326 n.10. To explain that approach, EPA cited DOE's data survey form PI-588. *Id.*

MATERIAL UNDER SEAL DELETED

But that form does not say that hedge losses should be excluded in calculating net refining margins. *Id.* at 294-298. To the contrary, the form's instructions explain that "Net Refinery Margin (dollars per barrel)" represents "the difference between the gross refining margin and the costs of producing and selling the petroleum products (e.g., refining energy costs and selling costs)" and that it "measures before-tax cash earnings from the production and sale of refined products." *Id.* at 96. Realized hedge gains and losses fall within that definition because they directly affect a refiner's gross refining margin, including its "before-tax cash earnings from the production and sale of refined products," and thus must be accounted for to determine net refining margin. Rather than explaining EPA's failure to account for realized hedge impacts in assessing net refining margin, form PI-588 confirms that EPA erred.

As a result of its error, EPA overstated WRC's net refining margin for the first half of 2013 (when WRC submitted its application) as $▮ per barrel and its 2012 net refining margin as $▮ per barrel. J.A. 326. Had EPA correctly accounted for WRC's realized hedge losses and gains, it would have found that WRC's net refining margins were

MATERIAL UNDER SEAL DELETED

significantly lower: $ ▮▮ per barrel in the first half of 2013 and $ ▮▮

per barrel in 2012. *Id.* at 295.

Worse, in comparing WRC to other refiners, EPA appears to have used refining margins for other companies that *did* account for hedge impacts. J.A. 331-332 (comparing WRC's margins to those of other refineries); see *id.* at 51 (explaining that "[t]he refining cash margin is typically used by the oil industry to evaluate the profitability of a given refinery [and] provides a way to measure the relative performance of one refinery versus another"). Just as WRC accounted for realized hedge impacts in completing PI-588—as the form (and basic accounting principles) require—other refiners likely did so as well. As DOE recognized, that is how refiners report refining margins when they state financial information on SEC Form 10-K. *See id.* at 51-52 (DOE Small Refinery Study explaining the relevance of "refining cash margin" and referencing refining margins as reported in SEC Forms 10-K, which account for realized hedge impacts). By comparing WRC's adjusted margins to other refiners' unadjusted margins, EPA compared apples to oranges so as to artificially overstate WRC's relative performance.

2. EPA also erred in looking to WRC's net income as a measure of its viability. Net income is not an accurate measure of available cash flow, which DOE has identified as the key factor in assessing whether compliance costs will affect a company's viability. J.A. 59 (explaining that when a refiner's cash flow is limited, additional compliance costs could "significantly impact the operation of the firm, leading eventually to an inability to increase efficiency to remain competitive, eventually resulting in closure"). That is because net income accounts for unrealized hedge impacts that have no impact on a refiner's profit margins or cash flow. J.A. 142, 166 (explaining to EPA why unrealized hedge impacts are generally not taken into account when calculating cash flow).

As WRC urged, EPA should have instead started with WRC's earnings before interest, taxes, depreciation, and amortization ("EBITDA"), which is a better proxy of a refiner's cash earnings, and is what refiners report in financial statements required by the SEC. *Id.* at 138 ("EBITDA, not non-cash results, is the standard basis for evaluating the economic health of a refining company"). And EPA should have adjusted EBITDA to account for the unavoidable cash outlays of

MATERIAL UNDER SEAL DELETED

capital expenditures, loan principal repayments, and interest payments. *Id.* at 201 (explaining 2014 cash flow constraints and concluding that "[t]his amount exceeds current 2013 EBITDA projections, including RIN purchases, by ██████████████").

Had EPA accounted for those impacts on WRC's available cash, it would have found that the company's operating cash flow for 2013 was effectively ████. *See, e.g., id.* at 183, 201. That fact caused WRC ██ ████████████████████████████████████████████. *Id.* at 326-327, 135-137, 279-280 ████ ████████████████████████████. EPA should have found that additional compliance costs would significantly impair WRC's ability to remain competitive, and thus its viability. The agency acted arbitrarily and capriciously in failing to consider WRC's available cash flow and relying on net income as a proxy for WRC's viability.

3. Even if net income were an appropriate metric, and even if it were appropriate to exclude the effect of hedges, EPA miscalculated WRC's 2013 net income as a result of a simple mathematical error. EPA correctly calculated WRC's net income excluding hedges for 2011

- 52 -

MATERIAL UNDER SEAL DELETED

and 2012. J.A. 326. But in calculating WRC's 2013 net income exclud-
ing hedges, EPA appears to have *added*, rather than *subtracted*, the
net realized and unrealized hedge impacts. EPA added WRC's overall
realized and unrealized hedge result, a financial, non-cash gain of $██
████, to its inclusive net income of $██████ and erroneously
found an exclusive net income of $██████. *Id*. To exclude the
hedge results, EPA should have subtracted the $██████, which
would have yielded a net income of just $██████. EPA thus over-
stated WRC's 2013 net income by $██████, or 73%. A key element
of EPA's analysis was its view that "WRC has been profitable enough
to afford the cost of [renewable fuel standard] compliance in 2013." *Id*.
at 331. EPA's miscalculation of WRC's net income seriously under-
mines that conclusion.

    4. Finally, EPA erred in calculating WRC's income by failing to
account for the tax implications of WRC's ownership structure. WRC is
an assumed business name of Hermes Consolidated, LLC, a Delaware
limited liability company that is a wholly-owned subsidiary of Black
Elk Refining, LLC, which is also a Delaware limited liability company.
J.A. 299 (diagram of ownership structure). It therefore differs from

MATERIAL UNDER SEAL DELETED

most other refiners, which are corporations. Like partnerships—and unlike ordinary corporations—limited liability companies are treated as pass-through entities for tax purposes, meaning that they do not themselves pay taxes but simply "pass through" their income to their owners, who report it on their own tax returns. *See* 26 U.S.C. § 701. Other refiners, organized as corporations, directly pay income taxes, which are typically about ▮▮▮ of pre-tax income. Thus, in order to meaningfully compare WRC's after-tax net income to that of other refiners, and in order to obtain an accurate measurement of WRC's cash flow (and thus the impact of compliance on its viability), EPA should have accounted for income taxes paid by the unit holders of Black Elk Refining on WRC's earnings. J.A. 326.  In failing to do so, EPA substantially overstated WRC's net income relative to other re-finers.

## CONCLUSION

The petition for review should be granted, EPA's order should be vacated, and the matter should be remanded to the agency for further proceedings.

Respectfully submitted.

LeAnn Johnson Koch
William Pedersen
Tyler G. Welti
PERKINS COIE LLP
700 13th St., N.W.
Washington, D.C. 20005
Telephone: 202.654.6200

Eric D. Miller
EMiller@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000

May 2014

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 10,611 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). I further certify that the brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook font.

_____

Eric D. Miller

Dated:     May 5, 2014

## CERTIFICATE OF SERVICE

I certify that on May 5, 2014, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system. I further certify that on May 5, 2014, I caused to be served by postage pre-paid, first class mail two public, redacted copies and two sealed, unredacted copies of foregoing brief on the following counsel of record:

> Justin D. Heminger
> United States Department of Justice
> Environment & Natural Resources Division
> Environmental Defense Section
> P.O. Box 7611
> Washington, DC 20044

Eric D. Miller

Dated:      May 5, 2014

# STATUTORY AND REGULATORY ADDENDUM

## STATUTORY AND REGULATORY ADDENDUM

## TABLE OF CONTENTS

42 U.S.C. § 7545(o) ................................................................ Add. 1

40 C.F.R. § 80.1141 .............................................................. Add. 25

## 42 U.S.C. § 7545(o)

(o) Renewable fuel program

(1) Definitions

In this section:

(A) Additional renewable fuel

The term "additional renewable fuel" means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in home heating oil or jet fuel.

(B) Advanced biofuel

(i) In general

The term "advanced biofuel" means renewable fuel, other than ethanol derived from corn starch, that has lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, that are at least 50 percent less than baseline lifecycle greenhouse gas emissions.

(ii) Inclusions

The types of fuels eligible for consideration as "advanced biofuel" may include any of the following:

(I) Ethanol derived from cellulose, hemicellulose, or lignin.

(II) Ethanol derived from sugar or starch (other than corn starch).

(III) Ethanol derived from waste material, including crop residue, other vegetative waste material, animal waste, and food waste and yard waste.

(IV) Biomass-based diesel.

(V) Biogas (including landfill gas and sewage waste treatment gas) produced through the conversion of organic matter from renewable biomass.

(VI) Butanol or other alcohols produced through the conversion of organic matter from renewable biomass.

(VII) Other fuel derived from cellulosic biomass.

(C) Baseline lifecycle greenhouse gas emissions

The term "baseline lifecycle greenhouse gas emissions" means the average lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, for gasoline or diesel (whichever is being replaced by the renewable fuel) sold or distributed as transportation fuel in 2005.

(D) Biomass-based diesel

The term "biomass-based diesel" means renewable fuel that is biodiesel as defined in section 13220(f) of this title and that has lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, that are at least 50 percent less than the baseline lifecycle greenhouse gas emissions. Notwithstanding the preceding sentence, renewable fuel derived from co-processing biomass with a petroleum feedstock shall be advanced biofuel if it meets the requirements of subparagraph (B), but is not biomass-based diesel.

(E) Cellulosic biofuel

The term "cellulosic biofuel" means renewable fuel derived from any cellulose, hemicellulose, or lignin that is derived from renewable biomass and that has lifecycle greenhouse gas emissions, as determined by the Administrator, that are at least 60 percent less than the baseline lifecycle greenhouse gas emissions.

(F) Conventional biofuel

The term "conventional biofuel" means renewable fuel that is ethanol derived from corn starch.

(G) Greenhouse gas

The term "greenhouse gas" means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, [FN9] sulfur hexafluoride. The Administrator may include any other anthropogenically-emitted gas that is determined by the Administrator, after notice and comment, to contribute to global warming.

(H) Lifecycle greenhouse gas emissions

The term "lifecycle greenhouse gas emissions" means the aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions such as significant emissions from land use changes), as determined by the Administrator, related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer, where the mass values for all greenhouse gases are adjusted to account for their relative global warming potential.

(I) Renewable biomass

The term "renewable biomass" means each of the following:

  (i) Planted crops and crop residue harvested from agricultural land cleared or cultivated at any time prior to December 19, 2007, that is either actively managed or fallow, and nonforested.

  (ii) Planted trees and tree residue from actively managed tree plantations on non-federal [FN10] land cleared at any time prior to December 19, 2007, including land belonging to an Indian tribe or

an Indian individual, that is held in trust by the United States or subject to a restriction against alienation imposed by the United States.

(iii) Animal waste material and animal byproducts.

(iv) Slash and pre-commercial thinnings that are from non-federal forestlands, including forestlands belonging to an Indian tribe or an Indian individual, that are held in trust by the United States or subject to a restriction against alienation imposed by the United States, but not forests or forestlands that are ecological communities with a global or State ranking of critically imperiled, imperiled, or rare pursuant to a State Natural Heritage Program, old growth forest, or late successional forest.

(v) Biomass obtained from the immediate vicinity of buildings and other areas regularly occupied by people, or of public infrastructure, at risk from wildfire.

(vi) Algae.

(vii) Separated yard waste or food waste, including recycled cooking and trap grease.

(J) Renewable fuel

The term "renewable fuel" means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in a transportation fuel.

(K) Small refinery

The term "small refinery" means a refinery for which the average aggregate daily crude oil throughput for a calendar year (as determined by dividing the aggregate throughput for the calendar year by the number of days in the calendar year) does not exceed 75,000 barrels.

(L) Transportation fuel

The term "transportation fuel" means fuel for use in motor vehicles, motor vehicle engines, nonroad vehicles, or nonroad engines (except for ocean-going vessels).

(2) Renewable fuel program

(A) Regulations

(i) In general

Not later than 1 year after August 8, 2005, the Administrator shall promulgate regulations to ensure that gasoline sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains the applicable volume of renewable fuel determined in accordance with subparagraph (B). Not later than 1 year after December 19, 2007, the Administrator shall revise the regulations under this paragraph to ensure that transportation fuel sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains at least the applicable volume of renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel, determined in accordance with subparagraph (B) and, in the case of any such renewable fuel produced from new facilities that commence construction after December 19, 2007, achieves at least a 20 percent reduction in lifecycle greenhouse gas emissions compared to baseline lifecycle greenhouse gas emissions.

(ii) Noncontiguous State opt-in

(I) In general

On the petition of a noncontiguous State or territory, the Administrator may allow the renewable fuel program established under this subsection to apply in the noncontiguous State or territory at the same time or any time after the Administrator promulgates regulations under this subparagraph.

(II) Other actions

In carrying out this clause, the Administrator may--

(aa) issue or revise regulations under this paragraph;

(bb) establish applicable percentages under paragraph (3);

(cc) provide for the generation of credits under paragraph (5); and

(dd) take such other actions as are necessary to allow for the application of the renewable fuels program in a noncontiguous State or territory.

(iii) Provisions of regulations

Regardless of the date of promulgation, the regulations promulgated under clause (i)--

(I) shall contain compliance provisions applicable to refineries, blenders, distributors, and importers, as appropriate, to ensure that the requirements of this paragraph are met; but

(II) shall not--

(aa) restrict geographic areas in which renewable fuel may be used; or

(bb) impose any per-gallon obligation for the use of renewable fuel.

(iv) Requirement in case of failure to promulgate regulations

If the Administrator does not promulgate regulations under clause (i), the percentage of renewable fuel in gasoline sold or dispensed to consumers in the United States, on a volume basis, shall be 2.78

percent for calendar year 2006.

(B) Applicable volumes

(i) Calendar years after 2005

(I) Renewable fuel

For the purpose of subparagraph (A), the applicable volume of renewable fuel for the calendar years 2006 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of renewable fuel (in billions of gallons): |
|---|---|
| 2006 | 4.0 |
| 2007 | 4.7 |
| 2008 | 9.0 |
| 2009 | 11.1 |
| 2010 | 12.95 |
| 2011 | 13.95 |
| 2012 | 15.2 |
| 2013 | 16.55 |
| 2014 | 18.15 |
| 2015 | 20.5 |
| 2016 | 22.25 |
| 2017 | 24.0 |
| 2018 | 6.0 |
| 2019 | 28.0 |
| 2020 | 30.0 |
| 2021 | 33.0 |

2022                                    36.0

(II) Advanced biofuel

For the purpose of subparagraph (A), of the volume of renewable fuel required under subclause (I), the applicable volume of advanced biofuel for the calendar years 2009 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of advanced biofuel (in billions of gallons): |
|---|---|
| 2009 | 0.6 |
| 2010 | 0.95 |
| 2011 | 1.35 |
| 2012 | 2.0 |
| 2013 | 2.75 |
| 2014 | 3.75 |
| 2015 | 5.5 |
| 2016 | 7.25 |
| 2017 | 9.0 |
| 2018 | 11.0 |
| 2019 | 13.0 |
| 2020 | 15.0 |
| 2021 | 18.0 |
| 2022 | 21.0 |

(III) Cellulosic biofuel

For the purpose of subparagraph (A), of the volume of advanced biofuel required under subclause (II), the applicable volume of cellulosic biofuel for the calendar years 2010 through 2022 shall be determined in accordance with the following table:

|  | Applicable volume of cellulosic biofuel |
| Calendar year: | (in billions of gallons): |
| 2010 | 0.1 |
| 2011 | 0.25 |
| 2012 | 0.5 |
| 2013 | 1.0 |
| 2014 | 1.75 |
| 2015 | 3.0 |
| 2016 | 4.25 |
| 2017 | 5.5 |
| 2018 | 7.0 |
| 2019 | 8.5 |
| 2020 | 10.5 |
| 2021 | 13.5 |
| 2022 | 16.0 |

(IV) Biomass-based diesel

For the purpose of subparagraph (A), of the volume of advanced biofuel required under subclause (II), the applicable volume of biomass-based diesel for the calendar years 2009 through 2012 shall be determined in accordance with the following table:

|  | Applicable volume of biomass-based diesel |
| Calendar year: | (in billions of gallons): |
| 2009 | 0.5 |
| 2010 | 0.65 |
| 2011 | 0.80 |
| 2012 | 1.0 |

(ii) Other calendar years

For the purposes of subparagraph (A), the applicable volumes of each fuel specified in the tables in clause (i) for calendar years after the calendar years specified in the tables shall be determined by the Administrator, in coordination with the Secretary of Energy and the Secretary of Agriculture, based on a review of the implementation of the program during calendar years specified in the tables, and an analysis of--

(I) the impact of the production and use of renewable fuels on the environment, including on air quality, climate change, conversion of wetlands, ecosystems, wildlife habitat, water quality, and water supply;

(II) the impact of renewable fuels on the energy security of the United States;

(III) the expected annual rate of future commercial production of renewable fuels, including advanced biofuels in each category (cellulosic biofuel and biomass-based diesel);

(IV) the impact of renewable fuels on the infrastructure of the United States, including deliverability of materials, goods, and products other than renewable fuel, and the sufficiency of infrastructure to deliver and use renewable fuel;

(V) the impact of the use of renewable fuels on the cost to consumers of transportation fuel and on the cost to transport goods; and

(VI) the impact of the use of renewable fuels on other factors, including job creation, the price and supply of agricultural commodities, rural economic development, and food prices.

The Administrator shall promulgate rules establishing the applicable volumes under this clause no later than 14 months before the first year for which such applicable volume will apply.

(iii) Applicable volume of advanced biofuel

For the purpose of making the determinations in clause (ii), for each calendar year, the applicable volume of advanced biofuel shall be at least the same percentage of the applicable volume of renewable fuel as in calendar year 2022.

(iv) Applicable volume of cellulosic biofuel

For the purpose of making the determinations in clause (ii), for each calendar year, the applicable volume of cellulosic biofuel established by the Administrator shall be based on the assumption that the Administrator will not need to issue a waiver for such years under paragraph (7)(D).

(v) Minimum applicable volume of biomass-based diesel

For the purpose of making the determinations in clause (ii), the applicable volume of biomass-based diesel shall not be less than the applicable volume listed in clause (i)(IV) for calendar year 2012.

(3) Applicable percentages

(A) Provision of estimate of volumes of gasoline sales

Not later than October 31 of each of calendar years 2005 through 2021, the Administrator of the Energy Information Administration shall provide to the Administrator of the Environmental Protection Agency an estimate, with respect to the following calendar year, of the volumes of transportation fuel, biomass-based diesel, and cellulosic biofuel projected to be sold or introduced into commerce in the United States.

(B) Determination of applicable percentages

(i) In general

Not later than November 30 of each of calendar years 2005 through 2021, based on the estimate provided under subparagraph (A), the Administrator of the Environmental Protection Agency shall determine and publish in the Federal Register, with respect to the following calendar year, the renewable fuel obligation that ensures that the requirements of paragraph (2) are met.

(ii) Required elements

The renewable fuel obligation determined for a calendar year under clause (i) shall--

(I) be applicable to refineries, blenders, and importers, as appropriate;

(II) be expressed in terms of a volume percentage of transportation fuel sold or introduced into commerce in the United States; and

(III) subject to subparagraph (C)(i), consist of a single applicable percentage that applies to all categories of persons specified in subclause (I).

(C) Adjustments

In determining the applicable percentage for a calendar year, the Administrator shall make adjustments--

(i) to prevent the imposition of redundant obligations on any person specified in subparagraph (B)(ii)(I); and

(ii) to account for the use of renewable fuel during the previous calendar year by small refineries that are exempt under paragraph (9).

(4) Modification of greenhouse gas reduction percentages

(A) In general

The Administrator may, in the regulations under the last sentence of paragraph (2)(A)(i), adjust the 20 percent, 50 percent, and 60 percent reductions in lifecycle greenhouse gas emissions specified in paragraphs (2)(A)(i) (relating to renewable fuel), (1)(D) (relating to biomass-based diesel), (1)(B)(i) (relating to advanced biofuel), and (1)(E) (relating to cellulosic biofuel) to a lower percentage. For the 50 and 60 percent reductions, the Administrator may make such an adjustment only if he determines that generally such reduction is not commercially feasible for fuels made using a variety of feedstocks, technologies, and processes to meet the applicable reduction.

(B) Amount of adjustment

In promulgating regulations under this paragraph, the specified 50 percent reduction in greenhouse gas emissions from advanced biofuel and in biomass-based diesel may not be reduced below 40 percent. The specified 20 percent reduction in greenhouse gas emissions from renewable fuel may not be reduced below 10 percent, and the specified 60 percent reduction in greenhouse gas emissions from cellulosic biofuel may not be reduced below 50 percent.

(C) Adjusted reduction levels

An adjustment under this paragraph to a percent less than the specified 20 percent greenhouse gas reduction for renewable fuel shall be the minimum possible adjustment, and the adjusted greenhouse gas reduction shall be established by the Administrator at the maximum achievable level, taking cost in consideration, for natural gas fired corn-based ethanol plants, allowing for the use of a variety of technologies and processes. An adjustment in the 50 or 60 percent greenhouse gas levels shall be the minimum possible adjustment for the fuel or fuels concerned, and the adjusted greenhouse gas reduction shall be established at the maximum achievable level, taking cost in consideration, allowing for the use of a variety of feedstocks, technologies, and processes.

(D) 5-year review

Whenever the Administrator makes any adjustment under this paragraph, not later than 5 years thereafter he shall review and revise (based upon the same criteria and standards as required for the initial adjustment) the regulations establishing the adjusted level.

(E) Subsequent adjustments

After the Administrator has promulgated a final rule under the last sentence of paragraph (2)(A)(i) with respect to the method of determining lifecycle greenhouse gas emissions, except as provided in subparagraph (D), the Administrator may not adjust the percent greenhouse gas reduction levels unless he determines that there has been a significant change in the analytical methodology used for determining the lifecycle greenhouse gas emissions. If he makes such determination, he may adjust the 20, 50, or 60 percent reduction levels through rulemaking using the criteria and standards set forth in this paragraph.

(F) Limit on upward adjustments

If, under subparagraph (D) or (E), the Administrator revises a percent level adjusted as provided in subparagraphs (A), (B), and (C) to a higher percent, such higher percent may not exceed the applicable percent specified in paragraph (2)(A)(i), (1)(D), (1)(B)(i), or (1)(E).

(G) Applicability of adjustments

If the Administrator adjusts, or revises, a percent level referred to in this paragraph or makes a change in the analytical methodology used for determining the lifecycle greenhouse gas emissions, such adjustment, revision, or change (or any combination thereof) shall only apply to renewable fuel from new facilities that commence construction after the effective date of such adjustment, revision, or change.

(5) Credit program

(A) In general

The regulations promulgated under paragraph (2)(A) shall provide--

    (i) for the generation of an appropriate amount of credits by any person that refines, blends, or imports gasoline that contains a quantity of renewable fuel that is greater than the quantity required under paragraph (2);

    (ii) for the generation of an appropriate amount of credits for biodiesel; and

    (iii) for the generation of credits by small refineries in accordance with paragraph (9)(C).

(B) Use of credits

A person that generates credits under subparagraph (A) may use the credits, or transfer all or a portion of the credits to another person, for the purpose of complying with paragraph (2).

(C) Duration of credits

A credit generated under this paragraph shall be valid to show compliance for the 12 months as of the date of generation.

(D) Inability to generate or purchase sufficient credits

The regulations promulgated under paragraph (2)(A) shall include provisions allowing any person that is unable to generate or purchase sufficient credits to meet the requirements of paragraph (2) to carry forward a renewable fuel deficit on condition that the person, in the calendar year following the year in which the renewable fuel deficit is created--

    (i) achieves compliance with the renewable fuel requirement under paragraph (2); and

(ii) generates or purchases additional renewable fuel credits to offset the renewable fuel deficit of the previous year.

(E) Credits for additional renewable fuel

The Administrator may issue regulations providing: (i) for the generation of an appropriate amount of credits by any person that refines, blends, or imports additional renewable fuels specified by the Administrator; and (ii) for the use of such credits by the generator, or the transfer of all or a portion of the credits to another person, for the purpose of complying with paragraph (2).

(6) Seasonal variations in renewable fuel use

(A) Study

For each of calendar years 2006 through 2012, the Administrator of the Energy Information Administration shall conduct a study of renewable fuel blending to determine whether there are excessive seasonal variations in the use of renewable fuel.

(B) Regulation of excessive seasonal variations

If, for any calendar year, the Administrator of the Energy Information Administration, based on the study under subparagraph (A), makes the determinations specified in subparagraph (C), the Administrator of the Environmental Protection Agency shall promulgate regulations to ensure that 25 percent or more of the quantity of renewable fuel necessary to meet the requirements of paragraph (2) is used during each of the 2 periods specified in subparagraph (D) of each subsequent calendar year.

(C) Determinations

The determinations referred to in subparagraph (B) are that--

(i) less than 25 percent of the quantity of renewable fuel necessary

to meet the requirements of paragraph (2) has been used during 1 of the 2 periods specified in subparagraph (D) of the calendar year;

(ii) a pattern of excessive seasonal variation described in clause (i) will continue in subsequent calendar years; and

(iii) promulgating regulations or other requirements to impose a 25 percent or more seasonal use of renewable fuels will not prevent or interfere with the attainment of national ambient air quality standards or significantly increase the price of motor fuels to the consumer.

(D) Periods

The 2 periods referred to in this paragraph are--

(i) April through September; and

(ii) January through March and October through December.

(E) Exclusion

Renewable fuel blended or consumed in calendar year 2006 in a State that has received a waiver under section 7543(b) of this title shall not be included in the study under subparagraph (A).

(F) State exemption from seasonality requirements

Notwithstanding any other provision of law, the seasonality requirement relating to renewable fuel use established by this paragraph shall not apply to any State that has received a waiver under section 7543(b) of this title or any State dependent on refineries in such State for gasoline supplies.

(7) Waivers

(A) In general

The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, may waive the requirements of paragraph (2) in whole or in part on petition by one or more States, by any person subject to the requirements of this subsection, or by the Administrator on his own motion by reducing the national quantity of renewable fuel required under paragraph (2)--

(i) based on a determination by the Administrator, after public notice and opportunity for comment, that implementation of the requirement would severely harm the economy or environment of a State, a region, or the United States; or

(ii) based on a determination by the Administrator, after public notice and opportunity for comment, that there is an inadequate domestic supply.

(B) Petitions for waivers

The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, shall approve or disapprove a petition for a waiver of the requirements of paragraph (2) within 90 days after the date on which the petition is received by the Administrator.

(C) Termination of waivers

A waiver granted under subparagraph (A) shall terminate after 1 year, but may be renewed by the Administrator after consultation with the Secretary of Agriculture and the Secretary of Energy.

(D) Cellulosic biofuel

(i) For any calendar year for which the projected volume of cellulosic biofuel production is less than the minimum applicable volume established under paragraph (2)(B), as determined by the Administrator based on the estimate provided under paragraph (3)(A), not later than November 30 of the preceding calendar year, the Administrator shall reduce the applicable volume of cellulosic biofuel required under paragraph (2)(B) to the projected volume

available during that calendar year. For any calendar year in which the Administrator makes such a reduction, the Administrator may also reduce the applicable volume of renewable fuel and advanced biofuels requirement established under paragraph (2)(B) by the same or a lesser volume.

(ii) Whenever the Administrator reduces the minimum cellulosic biofuel volume under this subparagraph, the Administrator shall make available for sale cellulosic biofuel credits at the higher of $0.25 per gallon or the amount by which $3.00 per gallon exceeds the average wholesale price of a gallon of gasoline in the United States. Such amounts shall be adjusted for inflation by the Administrator for years after 2008.

(iii) Eighteen months after December 19, 2007, the Administrator shall promulgate regulations to govern the issuance of credits under this subparagraph. The regulations shall set forth the method for determining the exact price of credits in the event of a waiver. The price of such credits shall not be changed more frequently than once each quarter. These regulations shall include such provisions, including limiting the credits' uses and useful life, as the Administrator deems appropriate to assist market liquidity and transparency, to provide appropriate certainty for regulated entities and renewable fuel producers, and to limit any potential misuse of cellulosic biofuel credits to reduce the use of other renewable fuels, and for such other purposes as the Administrator determines will help achieve the goals of this subsection. The regulations shall limit the number of cellulosic biofuel credits for any calendar year to the minimum applicable volume (as reduced under this subparagraph) of cellulosic biofuel for that year.

(E) Biomass-based diesel

(i) Market evaluation

The Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, shall periodically evaluate the impact of the biomass-based diesel requirements established under

this paragraph on the price of diesel fuel.

(ii) Waiver

If the Administrator determines that there is a significant renewable feedstock disruption or other market circumstances that would make the price of biomass-based diesel fuel increase significantly, the Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, shall issue an order to reduce, for up to a 60-day period, the quantity of biomass-based diesel required under subparagraph (A) by an appropriate quantity that does not exceed 15 percent of the applicable annual requirement for biomass-based diesel. For any calendar year in which the Administrator makes a reduction under this subparagraph, the Administrator may also reduce the applicable volume of renewable fuel and advanced biofuels requirement established under paragraph (2)(B) by the same or a lesser volume.

(iii) Extensions

If the Administrator determines that the feedstock disruption or circumstances described in clause (ii) is continuing beyond the 60-day period described in clause (ii) or this clause, the Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, may issue an order to reduce, for up to an additional 60-day period, the quantity of biomass-based diesel required under subparagraph (A) by an appropriate quantity that does not exceed an additional 15 percent of the applicable annual requirement for biomass-based diesel.

(F) Modification of applicable volumes

For any of the tables in paragraph (2)(B), if the Administrator waives--

(i) at least 20 percent of the applicable volume requirement set forth in any such table for 2 consecutive years; or

(ii) at least 50 percent of such volume requirement for a single year,

the Administrator shall promulgate a rule (within 1 year after issuing such waiver) that modifies the applicable volumes set forth in the table concerned for all years following the final year to which the waiver applies, except that no such modification in applicable volumes shall be made for any year before 2016. In promulgating such a rule, the Administrator shall comply with the processes, criteria, and standards set forth in paragraph (2)(B)(ii).

(8) Study and waiver for initial year of program

(A) In general

Not later than 180 days after August 8, 2005, the Secretary of Energy shall conduct for the Administrator a study assessing whether the renewable fuel requirement under paragraph (2) will likely result in significant adverse impacts on consumers in 2006, on a national, regional, or State basis.

(B) Required evaluations

The study shall evaluate renewable fuel--

(i) supplies and prices;

(ii) blendstock supplies; and

(iii) supply and distribution system capabilities.

(C) Recommendations by the Secretary

Based on the results of the study, the Secretary of Energy shall make specific recommendations to the Administrator concerning waiver of the requirements of paragraph (2), in whole or in part, to prevent any adverse impacts described in subparagraph (A).

(D) Waiver

(i) In general

Not later than 270 days after August 8, 2005, the Administrator shall, if and to the extent recommended by the Secretary of Energy under subparagraph (C), waive, in whole or in part, the renewable fuel requirement under paragraph (2) by reducing the national quantity of renewable fuel required under paragraph (2) in calendar year 2006.

(ii) No effect on waiver authority

Clause (i) does not limit the authority of the Administrator to waive the requirements of paragraph (2) in whole, or in part, under paragraph (7).

(9) Small refineries

  (A) Temporary exemption

  (i) In general

The requirements of paragraph (2) shall not apply to small refineries until calendar year 2011.

(ii) Extension of exemption

  (I) Study by Secretary of Energy

Not later than December 31, 2008, the Secretary of Energy shall conduct for the Administrator a study to determine whether compliance with the requirements of paragraph (2) would impose a disproportionate economic hardship on small refineries.

  (II) Extension of exemption

In the case of a small refinery that the Secretary of Energy determines under subclause (I) would be subject to a

disproportionate economic hardship if required to comply with paragraph (2), the Administrator shall extend the exemption under clause (i) for the small refinery for a period of not less than 2 additional years.

(B) Petitions based on disproportionate economic hardship

(i) Extension of exemption

A small refinery may at any time petition the Administrator for an extension of the exemption under subparagraph (A) for the reason of disproportionate economic hardship.

(ii) Evaluation of petitions

In evaluating a petition under clause (i), the Administrator, in consultation with the Secretary of Energy, shall consider the findings of the study under subparagraph (A)(ii) and other economic factors.

(iii) Deadline for action on petitions

The Administrator shall act on any petition submitted by a small refinery for a hardship exemption not later than 90 days after the date of receipt of the petition.

(C) Credit program

If a small refinery notifies the Administrator that the small refinery waives the exemption under subparagraph (A), the regulations promulgated under paragraph (2)(A) shall provide for the generation of credits by the small refinery under paragraph (5) beginning in the calendar year following the date of notification.

(D) Opt-in for small refineries

A small refinery shall be subject to the requirements of paragraph (2) if the small refinery notifies the Administrator that the small

refinery waives the exemption under subparagraph (A).

(10) Ethanol market concentration analysis

  (A) Analysis

    (i) In general

    Not later than 180 days after August 8, 2005, and annually thereafter, the Federal Trade Commission shall perform a market concentration analysis of the ethanol production industry using the Herfindahl-Hirschman Index to determine whether there is sufficient competition among industry participants to avoid price-setting and other anticompetitive behavior.

    (ii) Scoring

    For the purpose of scoring under clause (i) using the Herfindahl-Hirschman Index, all marketing arrangements among industry participants shall be considered.

  (B) Report

  Not later than December 1, 2005, and annually thereafter, the Federal Trade Commission shall submit to Congress and the Administrator a report on the results of the market concentration analysis performed under subparagraph (A)(i).

(11) Periodic reviews

To allow for the appropriate adjustment of the requirements described in subparagraph (B) of paragraph (2), the Administrator shall conduct periodic reviews of--

  (A) existing technologies;

  (B) the feasibility of achieving compliance with the requirements; and

(C) the impacts of the requirements described in subsection (a)(2) [FN11] on each individual and entity described in paragraph (2).

(12) Effect on other provisions

Nothing in this subsection, or regulations issued pursuant to this subsection, shall affect or be construed to affect the regulatory status of carbon dioxide or any other greenhouse gas, or to expand or limit regulatory authority regarding carbon dioxide or any other greenhouse gas, for purposes of other provisions (including section 7475) of this chapter. The previous sentence shall not affect implementation and enforcement of this subsection.

## 40 C.F.R. § 80.1141

§ 80.1141 Small refinery exemption.

(a)(1) Gasoline produced at a refinery by a refiner, or foreign refiner (as defined at § 80.1165(a)), is exempt from the renewable fuel standards of § 80.1105 and the requirements that apply to obligated parties under this subpart if that refinery meets the definition of a small refinery under § 80.1101(g) for calendar year 2004.

(2) This exemption shall apply through December 31, 2010, unless a refiner chooses to waive this exemption (as described in paragraph (f) of this section), or the exemption is extended (as described in paragraph (e) of this section).

(3) For the purposes of this section, the term "refiner" shall include foreign refiners.

(4) This exemption shall only apply to refineries that process crude oil, or feedstocks derived from crude oil, through refinery processing units.

(b)(1) The small refinery exemption is effective immediately, except as

specified in paragraph (b)(4) of this section.

(2) A refiner owning a small refinery must submit a verification letter to EPA containing all of the following information:

(i) The annual average aggregate daily crude oil throughput for the period January 1, 2004, through December 31, 2004 (as determined by dividing the aggregate throughput for the calendar year by the number 365).

(ii) A letter signed by the president, chief operating or chief executive officer of the company, or his/her designee, stating that the information contained in the letter is true to the best of his/her knowledge, and that the refinery was small as of December 31, 2004.

(iii) Name, address, phone number, facsimile number, and e-mail address of a corporate contact person.

(3) Verification letters must be submitted by August 31, 2007, to one of the addresses listed in paragraph (h) of this section.

(4) For foreign refiners the small refinery exemption shall be effective upon approval, by EPA, of a small refinery application. The application must contain all of the elements required for small refinery verification letters (as specified in paragraph (b)(2) of this section), must satisfy the provisions of § 80.1165(f) through (h) and (o), and must be submitted by August 31, 2007 to one of the addresses listed in paragraph (h) of this section.

(c) If EPA finds that a refiner provided false or inaccurate information regarding a refinery's crude throughput (pursuant to paragraph (b)(2)(i) of this section) in its small refinery verification letter, the exemption will be void as of the effective date of these regulations.

(d) If a refiner is complying on an aggregate basis for multiple refineries, any such refiner may exclude from the calculation of its Renewable Volume Obligation (under § 80.1107(a)) gasoline from any refinery receiving the small refinery exemption under paragraph (a) of

this section.

(e)(1) The exemption period in paragraph (a) of this section shall be extended by the Administrator for a period of not less than two additional years if a study by the Secretary of Energy determines that compliance with the requirements of this subpart would impose a disproportionate economic hardship on the small refinery.

　(i) A refiner may at any time petition the Administrator for an extension of its small refinery exemption under paragraph (a) of this section for the reason of disproportionate economic hardship.

　(ii) A petition for an extension of the small refinery exemption must specify the factors that demonstrate a disproportionate economic hardship and must provide a detailed discussion regarding the inability of the refinery to produce gasoline meeting the requirements of § 80.1105 and the date the refiner anticipates that compliance with the requirements can be achieved at the small refinery.

　(2) The Administrator shall act on such a petition not later than 90 days after the date of receipt of the petition.

(f) At any time, a refiner with an approved small refinery exemption under paragraph (a) of this section may waive that exemption upon notification to EPA.

　(1) A refiner's notice to EPA that it intends to waive its small refinery exemption must be received by November 1 to be effective in the next compliance year.

　(2) The waiver will be effective beginning on January 1 of the following calendar year, at which point the gasoline produced at that refinery will be subject to the renewable fuels standard of § 80.1105.

　(3) The waiver must be sent to EPA at one of the addresses listed in paragraph (h) of this section.

(g) A refiner that acquires a refinery from either an approved small refiner (as defined under § 80.1142(a)) or another refiner with an approved small refinery exemption under paragraph (a) of this section shall notify EPA in writing no later than 20 days following the acquisition.

(h) Verification letters under paragraph (b) of this section, petitions for small refinery hardship extensions under paragraph (e) of this section, and small refinery exemption waivers under paragraph (f) of this section shall be sent to one of the following addresses:

(1) For U.S. mail: U.S. EPA--Attn: RFS Program, 6406J, 1200 Pennsylvania Avenue, NW., Washington, DC 20460.

(2) For overnight or courier services: U.S. EPA, Attn: RFS Program, 6406J, 1310 L Street, NW., 6th floor, Washington, DC 20005.